[Cite as *King v. King*, 2016-Ohio-2681.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

MADISON COUNTY

TERESA KING,                                    :

    Petitioner-Appellee,                    :              CASE NO.   CA2015-03-009

    - vs -                                  :              O P I N I O N
                                               4/25/2016
                                                       :

JENNIFER KING, et al.,                          :

    Respondents-Appellants.                 :

APPEAL FROM MADISON COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 21340111

Teresa King, 2278 Big Run Road East, Grove City, Ohio 43123, petitioner-appellee, pro se

Stuart Y. Itani, 1108 City Park Avenue, Columbus, Ohio 43206, for respondent-appellee, Jennifer King

Shannon M. Treynor, 63 North Main Street, P.O. Box 735, London, Ohio 43140, for respondent-appellant, Joshua Gordon

**HENDRICKSON, J.**

{¶ 1}   Respondent-appellant, Joshua Gordon ("Father"), appeals from the judgment of the Madison County Common Pleas Court, Juvenile Division, that granted: (1) respondent-appellee, Jennifer King n.k.a. Jennifer Tussey ("Mother"), legal custody of their two children; (2) Father visitation with the children according to the juvenile court's standard visitation

schedule; and (3) the children's maternal grandmother, petitioner-appellee, Teresa King ("Grandmother"), the right to exercise one of Father's alternate weekends of visitation with the children. For the reasons set forth below, we affirm.

{¶ 2} Father and Mother are the parents of two minor children, J.G. and K.G., who were born in 2007 and 2012, respectively. In addition to the two children, both parties have children from a prior relationship. Mother has a child, A.R., who was born in 2005, and Father has two other children. Father and Mother never married throughout their seven to eight-year relationship that ended in February 2013. During their relationship, Father was employed outside the home in London, Ohio while Mother cared for the children. During this time, Mother was addicted to prescription pain medication.

{¶ 3} Following the parties' separation, A.R., J.G., and K.G. stayed with Mother, and Mother struggled financially because Father did not provide any monetary support. Between February 2013 and December 2014, Mother resided in six separate residences and was evicted twice. During this time, Mother had sporadic employment with a number of restaurants and a hardware store, and also worked with the Madison County prosecutor's office as a confidential informant in drug cases.

{¶ 4} After the separation, Mother and the three children initially remained in London, Ohio whereas Father moved approximately one hour away to St. Paris, Ohio to live with his new girlfriend and their respective four children from prior relationships. Father had little contact with J.G. and K.G. after the separation until early October 2013, when Mother had Father keep their children for a very brief time due to her financial situation. After their short stay with Father, Mother then had the children reside with Grandmother.

{¶ 5} On October 10, 2013, Grandmother initiated this action by filing a complaint in the Madison County Juvenile Court, naming Mother and Father as respondents and requesting custody of A.R., J.G., and K.G. That same day, the juvenile court granted

Grandmother emergency custody of the children. At the pretrial hearing on the complaint, Grandmother and Mother reached an agreement to provide Mother parenting time with the children. On February 6, 2014, the juvenile court switched the designation of custodian by ordering that: (1) Mother be designated temporary custodian of her three children; (2) Grandmother be awarded visitation with her three grandchildren one weekend per month; and (3) Father be awarded "reasonable visitation" with his and Mother's two children.

{¶ 6} On May 14, 2014, Father filed a separate complaint for "reallocation [sic] of parental rights and responsibilities." At this time, Father was represented by counsel, while Mother and Grandmother appeared pro se. According to Father, the parties entered into an agreement regarding their two children at a June 16, 2014 pretrial hearing. Subsequently, on June 26, 2014, the juvenile court adopted an entry entitled "Agreed Temporary Orders" that was prepared by Father's counsel and provided parenting time to Father on the first and third weekends of the month and for the third week of each summer month. The order was signed by the juvenile court judge and Father's attorney. Mother did not sign the order, but the signature line on the order intended for her signature states that Mother's approval was provided at the June 16 pretrial hearing.

{¶ 7} At some time during the pendency of the case, Mother relocated to Kentucky due to threats she received from drug offenders who were busted as a result of her drug informant activities. While in Kentucky, Mother married two months before the hearings. On September 17, 2014, Father moved to have Mother held in contempt for, among other things, her alleged failure to comply with the terms of the June 26 temporary custody order by not allowing him to exercise visitation with the children.

{¶ 8} A hearing was held on Father's complaint and contempt motion on December 11, 2014 and January 21, 2015. While on cross-examination, Mother acknowledged that her address "is currently under seal through the court."

- 3 -

{¶ 9}  On January 30, 2015, the juvenile court issued a journal entry in which it analyzed the facts and circumstances of this case, using the "best-interest" factors in R.C. 3109.04(F)(1).  The juvenile court found that "[t]here is no evidence that new facts or change in circumstance has occurred requiring modification to serve the best interest of the children" and "[t]here is no evidence that the harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the children."  The juvenile court also found that "the children are required to travel over significant periods of time and distance in order to visit with * * * [G]randmother, in addition to their [F]ather" and that "[G]randmother and [M]other do not have a great relationship, or so it appeared in the courtroom[.]"  The juvenile court then determined it was in the children's best interest that: (1) Mother be awarded legal custody of her and Father's two children; (2) Father be granted visitation according to the court's standard visitation schedule; and (3) Grandmother be awarded "the right to exercise one of * * * [F]ather's alternate weekends" of visitation with the children, with both of them "determin[ing] each month which weekend it will be."  The juvenile court ordered that all exchanges of the children for purposes of exercising visitation or parenting time are to take place in Ironton, Ohio, at a specific site to be determined by the parties.  The juvenile court also found that there was "no significant evidence of contempt of the [c]ourt's orders" by Mother and that her conduct appeared "to have been motivated by the best interest of the children."

{¶ 10} Father filed a timely notice of appeal from the juvenile court's January 30 journal entry.  On March 26, 2015, the state filed a motion in both the juvenile court and this court requesting that Mother's address be sealed since "releasing it may cause a danger to her."  The state explained that Mother "was an informant for the State in several drug trafficking cases and during the pendency of these cases was threatened and had to relocate."  Father did not respond to the motion.  On April 3, 2015, the juvenile court granted

the state's motion and issued an entry stating that Mother's address "shall be sealed by the Court and shall only be opened on an as needed basis for this court's use." On July 2, 2015, this court granted the state's motion to seal Mother's address.

{¶ 11} Father now appeals from the juvenile court's January 30 journal entry, assigning the following as error:

{¶ 12} Assignment of Error No. 1:

{¶ 13} THE COURT ABUSED ITS DISCREATION [sic] BY FINDING THAT THE CHILDREN'S BEST INTERESTS ARE SERVED BY PLACING CUSTODY WITH THE MOTHER.

{¶ 14} Assignment of Error No. 2:

{¶ 15} THE COURT ABUSED ITS DISCRETION BY AWARDING THE FATHER STANDARD ORDER VISITATION, AND SUBSEQUENTLY AWARDING ONE OF HIS WEEKENDS TO THE MATERNAL GRANDMOTHER.

{¶ 16} Assignment of Error No. 3:

{¶ 17} THE COURT ABUSED ITS DISCRETION BY REQUIRING THE APPELLANT FATHER TO DRIVE THREE HOURS ONE WAY TO FACILITATE VISITATION, WHEN THE APPELLEE MOTHER UNILATERALLY RELOCATED DURING THE COURSE OF THE PROCEEDINGS.

{¶ 18} Assignment of Error No. 4:

{¶ 19} THE COURT ABUSED ITS DISCRETION BY HARBORING THE APPELLEE'S ADDRESS UNDER SEAL, THEREBY PREVENTING THE CHILDREN'S OWN FATHER FROM KNOWING THEIR WHEREABOUTS.

{¶ 20} In his first assignment of error, Father initially argues the juvenile court erred in finding that there was no "change of circumstances" in this case. We agree.

{¶ 21} The juvenile court found that "[t]here is no evidence that new facts or change in

circumstance has occurred requiring modification to serve the best interest of the children" and "[t]here is no evidence that the harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the children." While the juvenile court failed to specify why it was making these findings, it is apparent the court was making them under R.C. 3109.04(E)(1)(a) since the statute contains these same requirements, i.e., change of circumstance, best interest, and the harm outweighs the advantages in the change of environment to the child. The juvenile court then allocated the parental rights and responsibilities for the care of the children between Father and Mother and awarded companionship rights or visitation to Grandmother based upon the best interest of the children.

{¶ 22} We first note that the juvenile court inappropriately considered the factors under R.C. 3109.04(E)(1)(a). This section applies to motions to modify a prior decree allocating parental rights and responsibilities, but it does not apply to temporary orders or interlocutory orders. *Taylor v. Taylor*, 9th Dist. Lorain No. 11CA10071, 2012-Ohio-4097, ¶ 6. The juvenile court made the findings required under R.C. 3109.04(E)(1)(a) in the mistaken belief that the case before it involved a request to modify a prior decree regarding the allocation of parental rights and responsibilities. However, no such prior decree had ever been issued in this case. Instead, the only orders that had been issued were the juvenile court's October 10, 2013 order granting Grandmother emergency custody of Mother's children and the June 26, 2014 Agreed Temporary Orders, neither of which constituted a "prior decree allocating parental rights and responsibilities for the care of children," for purposes of R.C. 3109.04(E)(1)(a). The record shows that this case involves an *original* proceeding to allocate parental rights and responsibilities, and therefore, the juvenile court was not required to make the findings required by R.C. 3109.04(E)(1)(a) before examining the children's best interest.

{¶ 23} Nevertheless, the juvenile court's error in making findings under R.C.

3109.04(E)(1)(a) was harmless, since the court examined the best-interest factors in R.C. 3109.04(F)(1) and made a best-interest determination regarding custody in light of those factors. Consequently, we now turn to Father's principal argument under this assignment of error that the juvenile court erred by finding it was in the children's best interest to grant custody to Mother.

{¶ 24} Father contends the juvenile court erred in making a number of factual findings regarding several of the best-interest factors in R.C. 3109.04(F)(1). However, a review of the record shows there is ample evidence to support the juvenile court's factual findings and the juvenile court's factual findings are not contrary to the manifest weight of the evidence.[1]

{¶ 25} As to R.C. 3109.04(F)(1)(a), "[t]he wishes of the child[ren]'s parents regarding the child[ren]'s care[,]" the evidence supports the juvenile court's finding that "[e]ach of the children's parents request[ed] an order placing custody with them individually."

{¶ 26} As to R.C. 3109.04(F)(1)(c) regarding "[t]he child[ren]'s interaction and interrelationship with the child[ren]'s parents, siblings, and any other person who may significantly affect the child[ren]'s best interest," the juvenile court found that Mother has been the children's primary caregiver for nearly all of their lives. However, Father contends that during the eight years he and Mother lived together, he was the "primary breadwinner" and that Mother did not work or feel the need to do so. He also contends that while Mother "may have provided care for the children," her testimony revealed that she felt no need to provide for them financially since that was the responsibility of the children's fathers. We find Father's contentions unpersuasive.

---

1. Several of the best-interest factors in R.C. 3109.04(F)(1)(a)-(j) are clearly inapplicable to this case. R.C. 3109.04(F)(1)(b) is inapplicable, since the juvenile court did not interview the children in chambers; R.C. 3109.04(F)(1)(g) is inapplicable, since there was no child support order in effect at the time of the proceedings; and R.C. 3109.04(F)(1)(h) is inapplicable, since there is no evidence that either parent has been convicted of any of the offenses listed in that provision.

{¶ 27} The evidence shows that during the seven to eight years of her relationship with Father, Mother was a stay-at-home mother who cared for not only the two children she had with Father, but also her child from a prior relationship and Father's two children from a prior relationship. Mother focused on ensuring the children's day-to-day needs, as well as their educational, extracurricular, and medical needs. After she and Father separated, Mother continued as the primary caretaker of their two children and her child from a prior relationship.

{¶ 28} Father asserts that "he coached his children's sports teams, and remained present and active in their lives." However, Mother testified that Father has never asked her about their children's progress in school, Father has failed to provide her with any financial assistance since the separation, and Father has only seen the children sporadically. We also note that, after their separation in February 2013, Father moved one hour away from Mother and the children so that he could live with his new girlfriend and their new blended family. Additionally, Father waited approximately 15 months to file a complaint requesting custody of his and Mother's two children.

{¶ 29} Father next argues the juvenile court also erred by placing too much emphasis on his present living arrangements for the children. However, if he were granted custody of the parties' two children, Father would have a total of six children living in his three-bedroom home along with his new girlfriend. This would result in the six children having to share only two bedrooms that Father has available for the children. Father points out that, at one time, Mother had the children sleeping on a mattress on the floor in a single room apartment. Unfortunately, Father forgets this living arrangement occurred during the period in which Father failed to provide Mother with any financial support.

{¶ 30} Father also faults the juvenile court for ignoring the reason his current living quarters "would be so cozy" if he were granted custody of the parties' two children is that he

is currently the primary care provider for the four children who currently reside with him (i.e., his other two children from a prior relationship and his new girlfriend's two children). The fact that Father is the primary care provider for his present family does not change the fact that his current living quarters would be crowded and uncomfortable for six children. The trial court considered the living arrangements in both households and found Mother's to be in the children's best interest. We cannot conclude that this finding was against the manifest weight of the evidence based upon the record before us.

{¶ 31} Father finally contends that Mother is an illegal substance addict who "presented no evidence of rehabilitation[,]" and that while Mother testified she attended group counseling sessions, she failed to offer any documentary evidence to support her claim. However, the juvenile court found that, since her separation from Father, Mother has apparently overcome her drug-addicted past, as she has been drug free for over a year, has remarried, and is now living a normal life. Mother's testimony that she attends a group counseling session to deal with her addiction supports the juvenile court's findings, and the juvenile court was in the best position to assess the credibility of Mother's testimony. *Davis v. Flickinger*, 77 Ohio St.3d 415, 418 (1997).

{¶ 32} As to R.C. 3109.04(F)(1)(d), "[t]he child[ren]'s adjustment to [their] home, school, and community[,]" the juvenile court found that "[t]he children appear to be well adjusted to their home and school in Kentucky[,]" and Father presented no evidence to dispute this finding. As to R.C. 3109.04(F)(1)(e), "[t]he mental and physical health of all persons involved in the situation[,]" the juvenile court found that "[t]here is no evidence of significant mental or physical health issues[,]" and Father has not explicitly raised any issue under this factor except his reference to Mother's addiction to pain killers, which we have discussed above.

{¶ 33} As to R.C. 3109.04(F)(1)(f), the juvenile court found "[i]t appears that each

parent is as likely as the other to honor and facilitate court-approved parenting time rights or visitation and companionship rights." Father contends that Mother was only willing to facilitate visitation with the children's respective fathers and Grandmother when it was on her terms, which included requiring all other parties to drive two or three hours in order to visit with the children. Father also points out that it was Mother who, unilaterally, chose to relocate outside the state, and to be unemployed and thus unable to afford gas money.

{¶ 34} However, Father is forgetting that he was the first one to move away from London, Ohio where the parties had resided during their relationship. This move resulted in additional traveling time for Father under the juvenile court's decision that the exchange of the children occur in Ironton, Ohio. As to Mother's employment or the lack thereof, both Father and Mother made the decision during their relationship to have Mother stay at home to care for the parties' children, which lessened Mother's future earnings ability. Additionally, Mother testified at trial that she had been trying to facilitate parenting time with Father since she moved to Kentucky to protect her and her children's safety and that it would be a financial hardship on her if she were forced to comply with Father's requests regarding parenting time and travel requirements. The juvenile court was in the best position to judge the credibility of the parties' testimony. *Davis,* 77 Ohio St.3d at 418.

{¶ 35} As to R.C. 3109.04(F)(1)(g), "[w]hether the residential parent * * * has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court[,]" the juvenile court found that "[t]here is no evidence that either parent has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the [c]ourt." As part of its decision, the juvenile court rejected Father's pretrial motion to have Mother held in contempt for denying him his parenting time. The juvenile court rightfully determined that there was "no significant evidence" Mother was in contempt of the court's temporary parenting-time order and Mother's conduct appeared to

have been motivated by the children's best interest, i.e., protecting them from threats being made as a result of Mother's confidential informant role. Furthermore, Father did not challenge the juvenile court's decision overruling his contempt motion against Mother.

{¶ 36} Finally, as to R.C. 3109.04(F)(1)(j), "[w]hether either parent has established a residence, or is planning to establish a residence, outside this state[,]" the juvenile court simply noted that Mother "has, as indicated previously, relocated to the State of Kentucky." The juvenile court found that Mother's relocation was the result of protecting herself and the children and, thus, not for selfish or personal reasons. In addition, the juvenile court also found, as to R.C. 3109.04(F)(1)(d), that "[t]he children appear to be well adjusted to their home and school in Kentucky[.]" As we determined earlier in this decision, Father has presented no evidence to dispute this finding.

{¶ 37} In light of the foregoing, we find no error in the juvenile court's designation of Mother as the children's legal custodian. Father's first assignment of error is overruled.

{¶ 38} In his second assignment of error, Father asserts the juvenile court erred by awarding one weekend of his monthly parenting time to Grandmother. While Father acknowledges that Grandmother should have companionship or visitation rights with the children, he basically contends that he shouldn't be punished by having to give up one of his monthly weekend parenting times because of the strained relationship between Mother and Grandmother. We disagree with this argument.

{¶ 39} Parents have a "fundamental right * * * to make decisions concerning the care, custody, and control of their children[,]" and to raise their children as they see fit. *Troxel v. Granville*, 530 U.S. 57, 66, 120 S.Ct. 2054 (2000); *Harold v. Collier*, 107 Ohio St.3d 44 (2005), ¶ 40. Grandparents, on the other hand, do not have "inherent legal rights" to visitation with their grandchildren "based simply on the family relationship." *In re H.W.*, 114 Ohio St.3d 65, 2007-Ohio-2879, ¶ 9. Instead, a grandparent's right to have contact with his

or her grandchild is set forth by statute.

{¶ 40} R.C. 3109.12 governs the establishment of parenting time rights and companionship or visitation rights for children born out of wedlock. Under R.C. 3109.12(A), if a child is born to an unmarried woman, the parents of the woman and any of her relatives may file a complaint requesting the common pleas court of the county in which the child resides to grant them reasonable companionship or visitation rights with the child. Likewise, the statute further provides that if the child's father has acknowledged the child and the acknowledgment has become final under R.C. 2151.232, 3111.25, or 3111.821, or has been determined to be the child's father in an action under R.C. Chapter 3111, the father may file a complaint requesting the common pleas court to grant him reasonable parenting time rights with the child, and the father's parents or relatives may request the court to grant them reasonable companionship or visitation rights with the child.

{¶ 41} Pursuant to R.C. 3109.12(B), the court may grant the parenting time rights or companionship or visitation rights requested if it determines that granting such rights is in the child's best interest. This section further provides that in determining whether to grant such rights, the court must consider "all relevant factors," including but not limited to the factors in R.C. 3109.051(D). A grandparent or other nonparent has the burden of proving that visitation will be in the child's best interest. *In re N.C.W.*, 12th Dist. Butler No. CA2013-12-229, 2014-Ohio-3381, ¶ 25-28. Additionally, absent an allegation of parental unfitness, "Ohio courts are obligated to afford some special weight to the wishes of parents of minor children when considering petitions for nonparental visitation made pursuant to R.C. 3109.11 or 3109.12." *Harrold*, 2005-Ohio-5334 at ¶ 12.

{¶ 42} In the present case, both Father and Mother agree that Grandmother should have companionship time with the children. The juvenile court gave special weight to their wishes by awarding Grandmother companionship or visitation rights with the children. The

issue before us is whether the juvenile court abused its discretion in the manner in which it gave such rights to Grandmother.

{¶ 43} Father argues that the only reason the juvenile court took away one of his monthly weekend visitations was because of the strained relationship it found to exist between Mother and Grandmother. If this were the case, we would agree with Father and sustain this assignment of error. However, this simply was not the only reason cited by the juvenile court in its January 30 journal entry.

{¶ 44} Before ruling on the pleadings before it, the juvenile court also found that "the children are required to travel over significant periods of time and distance in order to visit with * * * [G]randmother, in addition to their [F]ather[.]" The juvenile court took into consideration that if Grandmother were given a separate weekend during the month, this would require the children to be on the road for long hours three weekends per month. Finding this was not in the children's best interest, the juvenile court then structured Father's parenting time and Grandmother's companionship or visitation rights accordingly.

{¶ 45} We do not find that this resulted in such a manifest injustice under the facts of this case. While we acknowledge the importance of Father's right to develop and maintain his relationship with his children, we must also consider the fact that Father saw the children sporadically after his separation with Mother and did not provide them with any support. Likewise, for several months during the pendency of this case, Father was provided only "reasonable visitation" with the two children. Furthermore, in addition to his one weekend per month, the juvenile court awarded Father extended parenting time with the children during portions of major holidays and "[s]pring [b]reak," and for "six consecutive weeks during the [s]ummer [v]acation of the school district in which the children reside." Based upon the foregoing, we find the juvenile court did not abuse its discretion when it determined it was in the children's best interest to award one of Father's two monthly weekends to Grandmother

for companionship or visitation rights.

**{¶ 46}** In light of the foregoing, Father's second assignment of error is overruled.

**{¶ 47}** In his third assignment of error, Father contends the juvenile court abused its discretion by requiring him "to bear the sole burden" of transporting the children from St. Paris, Ohio to Ironton, Ohio for the exchange of the parties' children for visitation purposes. We disagree with this argument.

**{¶ 48}** "When fashioning a visitation order for a non-residential parent, juvenile courts are required to issue an order that is 'just and reasonable' under all the conditions the court directs." *Ornelas v. Ornelas*, 12th Dist. Warren No. CA2011-08-094, 2012-Ohio-4106, ¶ 60. A court has considerable discretion in restricting the time and place of parental visitation and to determine the conditions under which visitation is to take place. *Shafor v. Shafor*, 12th Dist. Warren No. CA2008-01-015, 2009-Ohio-191, ¶ 9. This, logically, includes establishing the location for parenting time exchanges. Additionally, while there is no statutory authority that permits a juvenile court to allocate travel expenses associated with visitation, it has been held that a juvenile court may do so in the exercise of its discretion. *Ornelas*; *Hurst v. Hurst*, 12th Dist. Warren No. CA2013-10-100, 2014-Ohio-4762, ¶ 13.

**{¶ 49}** When allocating travel expenses associated with visitation, courts have considered such factors as the parents' respective incomes and whether one parent voluntarily moved away from the area of the parties' marital residence. *Ornelas*, citing *Burnett v. Burnett*, 2d Dist. Clark No. 02-CA04, 2002 WL 1483212 (July 12, 2002). In *Burnett*, a visitation order requiring a mother to bear the entire travel expense associated with visitation was upheld where the mother earned substantially more income than the father and where mother had voluntarily moved away from the area of their marital residence. *Id.* at *3.

**{¶ 50}** Mother testified that it takes her about 25 minutes to drive from her home in Kentucky to Ironton to exchange the children for visitation and parenting time, requiring her to

- 14 -

make a round trip of less than one hour to facilitate visitation and parenting time. Father estimates his travel time for exercising his parenting time with the children as being "two and one-half hours one way." However, the length of time that Father is required to travel is not uncommon in our mobile life styles, and making Father responsible for the transportation costs is not unreasonable in light of the fact that Father is better able to pay those costs. *See, e.g.*, *Koeppen v. Swank*, 12th Dist. Butler No. CA2008-09-234, 2009-Ohio-3675, ¶ 38 (trial court did not abuse its discretion in making mother responsible for the transportations costs associated with father's parenting time where mother moved to Hawaii, there was no evidence presented indicating that the costs associated with transporting the child from Hawaii to Ohio four times a year would create a financial hardship for mother or otherwise overburden her, mother acknowledged that the increased distance was difficult in terms of facilitating father's parenting time, and the evidence showed that free military stand-by flights may have been available to transport child). *See also Tuckosh v. Tuckosh*, 7th District, Harrison No. 00 526 CA., 2002-Ohio-1154, ¶ 73 (trial court did not abuse its discretion in requiring former husband to drive both ways for visitation with his children and to provide all transportation for visitation with his children even though former wife was the party who moved to new city after the couple separated, since former husband had access to company vehicles and drove a sport utility vehicle while former wife drove an unreliable automobile).

{¶ 51} Also, Mother moved from London, Ohio to Kentucky to protect her and the children's safety, whereas Father moved approximately an hour away from London to St. Paris in order to live with his new girlfriend and her two children. Father's move resulted in additional traveling time to Ironton for the exchange.

{¶ 52} Furthermore, Father was the party who was best able to handle the travel-related expenses since he has a history of steady and substantial employment. Mother, on the other hand, has more limited financial resources as a result of being the primary

caregiver of the parties' children. Given the foregoing, we find no abuse of discretion in the juvenile court's decision requiring Father to provide transportation from his home in St. Paris to the exchange in Ironton for purposes of exercising his parenting time, even though Father is required to spend more travel time and expense than Mother.

{¶ 53} Therefore, Father's third assignment of error is overruled.

{¶ 54} In his fourth assignment of error, Father argues the juvenile court abused its discretion by sealing Mother's address, since it prevents him from knowing his children's whereabouts. He contends that the state's rationale for asking that Mother's address be sealed had nothing to do with her relationship with him or any other party in this case, but instead, was based on her former involvement as an undercover drug informant. He also asserts there is nothing in the record that suggests he would "abuse the knowledge of his children's whereabouts," and that allowing him to know where his children live would "bolster" his relationship with them since he has no ability, at present, to send the children cards or letters.

{¶ 55} However, both the state's motion to seal Mother's address and the juvenile court's decision granting it were filed *after* the juvenile court issued its January 30, 2015 journal entry, from which Father filed a timely notice of appeal. Father did not file a notice of appeal from the juvenile court's April 30, 2015 journal entry granting the state's motion to seal Mother's address, nor has he sought leave to file a delayed appeal from that entry.

{¶ 56} Admittedly, at the hearing held on Father's motion to "reallocate" parental rights and responsibilities, Mother acknowledged under cross-examination by Father's counsel that her "address is currently under seal through the court[.]" Thus, it appears that the juvenile court may have either sealed, or informed the parties of its intention to seal, Mother's address before the court issued its January 30 entry. However, it is well settled that "a court speaks only through its journal entries." *Infinite Sec. Sols., L.L.C. v. Karam Properties, II, Ltd.*, 143

Ohio St. 3d 346, 353, 2015-Ohio-1101, ¶ 29. Further, "an entry is effective only when it has been journalized, that is, when it has been reduced to writing, signed by a judge, and filed with the clerk so that it may become a part of the permanent record of the court." *Huntington Natl. Bank v. Donatini,* 12th Dist. Warren No. CA2014-08-105, 2015-Ohio-67, ¶ 10.

{¶ 57} Here, the juvenile court's entry sealing Mother's address was not journalized until April 3, 2015, which is well after the juvenile court issued its final judgment in this case on January 30, 2015, from which Father filed a timely notice of appeal. Thus, the juvenile court's April 3, 2015 entry granting the state's motion to seal Mother's address is not properly before us in this appeal, and therefore we have no jurisdiction to rule on this assignment of error.

{¶ 58} Judgment affirmed.

M. POWELL, P.J., and S. POWELL, J., concur.